IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| SHANNON SANDERS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No.3:04cv00307 SWW |
| | * | |
| | * | |
| | * | |
| KAREN LAKIN, M.D., ROBERT V. | * | |
| WALLING, M.D., Individually and as | * | |
| agent for METHODIST LEBONHEUR | * | |
| HOSPITAL, and METHODIST | * | |
| HEALTHCARE-MEMPHIS HOSPITAL, | * | |
| d/b/a LEBONHEUR CHILDREN | * | |
| MEDICAL CENTER, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

Plaintiff Shannon Sanders, mother of minor child Branson Sanders, both Arkansas residents, alleges that Karen Lakin, M.D., and Robert V. Walling, M.D., doctors at Methodist Healthcare-Memphis Hospital d/b/a LeBonheur Children Medical Center (also named by plaintiff as Methodist LeBonheur Hospital) (hereinafter, "LeBonheur"), falsely accused and reported to the Arkansas Department of Human Services ("DHS") and the West Memphis Police Department that Branson was a victim of child abuse based on injuries (broken ribs) he exhibited upon his admission to LeBonheur despite the fact that Branson's injuries were suspected (and later determined) to be the result of a growing tumor. By Order dated January 31, 2006, this Court granted plaintiff's motion to voluntarily dismiss separate defendant Karen Lakin, M.D. [doc.#42]. The remaining defendants have filed the following motions: (1) motion for summary judgment by LeBonheur [doc.#46]; and (2) motion for summary judgment by Dr. Walling

[doc.#53].  Plaintiff has responded in opposition to both motions, and LeBonheur and Dr. Walling have each replied to plaintiff's response.  Having considered the matter, the Court finds that both motions for summary judgment should be and hereby are granted.

I.

The underlying facts are essentially undisputed.  On January 19, 2003, plaintiff brought her seven week old infant son, Branson Sanders, to the emergency room at LeBonhuer Children's Medical Center in Memphis, Tennessee.  An x-ray revealed that Branson had sustained a fracture of the tenth rib.  Given Branson's young age and the unexplained nature of the injury, it was suspected that the injury was the result of child abuse.  Consequently, the incident was referred to Dr. Walling, a member of LeBonheur's Child Abuse and Neglect Committee.

On January 20, 2003, an exam was performed on Branson, the x-ray of which revealed additional rib abnormalities.  The report noted that "[w]hile we are concerned about trauma, we believe that there are some other diagnostic possibilities."  The following day, a social worker with LeBonheur's Department of Social Work investigated Branson's family situation.

On January 22, 2003, Dr. Walling reviewed the medical records, conducted a consult with the family, and determined that Branson's injuries were suspicious of abuse because it was an unexplained injury on a seven week old infant.  In this respect, Dr. Walling states he suspected possible child abuse because, among other things, it was discovered by the boyfriend of plaintiff's roommate as opposed to the mother or primary care giver and because of the unconventional living arrangements that the mother had at the time with her roommate and the

roommate's boyfriend. Walling Depo. at 69. Dr. Walling further noted he had seen over a hundred cases in which a rib was broken like Branson's and that every one of those injuries was the result of child abuse. Walling Depo. at 30. Dr. Walling recommended that the police and the Department of Children Services be contacted to report this case as suspected abuse.

On January 22, 2003, the social worker notified the Arkansas Department of Children's Services and the West Memphis Police Department that Branson had sustained an unexplained rib fracture which was suspicious of abuse. Detective Mark McDougal of the West Memphis Police Department conducted an investigation into Branson's situation. Neither Dr. Walling nor anyone else at LeBonheur ever accused plaintiff of having abused Branson, Pl.'s Depo. at 57, 59; McDougal Depo. at 13, 37; Walling Depo. at 30, and McDougal testified that, in his opinion, there was no indication that Dr. Walling or anyone from LeBonheur acted with any type of malice or bad faith in diagnosing Branson. McDougal Depo. at 21-22.

On January 23, 2003, Branson was released into the care and custody of plaintiff. Plaintiff states she agreed to participate in a consultation with a LeBonheur social worker as a condition of having her child discharged back to her. Pl.'s Resp. to Def.s' Mot.s for Summ. J. at 2. She also agreed to meet with McDougal before leaving the hospital with Branson and to bring Branson back to the hospital on January 30, 2003, for further testing. *Id*. at 2-3. Branson was never taken out of plaintiff's care and custody as a result of the social worker's or Dr. Walling's report to the authorities.

On January 30, 2003, Branson returned to LeBonheur as an outpatient for additional x-rays. These x-rays were compared to the x-ray taken on January 20, 2003, and it was determined that Branson had sustained fractures to three additional ribs, the seventh, eighth, and ninth ribs.

The report by Dr. Robert A. Kaufman states that "I am still concerned that the patient has injured a mass or malformation of the chest wall and secondarily or pathologically fractured a few ribs nearby. We could obtain an additional follow-up examination in another 10 to 14 days, but I think that the mass, if it persists, will likely require biopsy." Pl.'s Ex. 3.

LeBonheur forwarded a copy of Dr. Kaufman's January 30, 2003 x-ray report to Detective McDougal. McDougal Aff. at ¶ 4. Upon further investigation and testing weeks later, it was determined by Arkansas Children's Hospital that Branson's fractured ribs were caused by a growing mass. Detective McDougal was so informed on March 10, 2003, and he closed the investigation. This lawsuit followed.

II.

A.

As a preliminary matter, the Court notes that on February 17, 2006, the parties jointly stipulated that (1) defendants acted appropriately in their initial reporting of suspected child abuse to the authorities on or about January 22, 2003 and did not violate Tennessee and/or Arkansas laws by reporting same, (2) plaintiff makes no claim for damages against defendants for the subsequent treatment of Branson Sanders at Arkansas Children's Hospital, (3) the facts alleged in the complaint do not constitute and plaintiff is making no claim for medical malpractice, medical negligence and/or medical injury, and (4) plaintiff makes no claim whatsoever based upon any actions of the defendants prior to the x-ray taken by Dr. Kauffman on January 30, 2003 [doc.#57]. In her response to defendants' motion for summary judgment, plaintiff implicitly acknowledges this stipulation, stating that her "sole contention with the

defendants is that after January 30th, they were aware of a high likelihood of a secondary diagnosis," and that "[t]his diagnosis, which was made by LeBonheur's own doctors and turned out to be correct, was never communicated to the Arkansas police or [DHS]." Pl.'s Resp. to Def.s' Motions for Summ. J. at 10 [doc.#62]. Therefore, states plaintiff, "the Arkansas 'good faith' requirement regarding reporting was violated." *Id.* In this respect, plaintiff, in her response to defendants' motions for summary judgment, addresses only her false-light and outrage claims. Accordingly, this Court will address defendants' motions for summary judgment in light of the parties' joint stipulation and plaintiff's representations of the nature of her contention with defendants as set forth in her response to defendants' motions for summary judgment, namely that she is pursuing only false light and outrage claims against defendants for allegedly not communicating to Arkansas authorities what she claims to be a "high likelihood of a secondary diagnosis" as set forth in the x-ray report of January 30, 2003.[1]

B.

Having determined the nature of plaintiff's contention with defendants, this Court must now determine whether Tennessee or Arkansas law applies. This determination is made utilizing Dr. Robert A. Leflar's five "choice influencing considerations": (1) predictability of results, (2) maintenance of interstate and international order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. *Gomez v. ITT Educational Services, Inc.*, 71 S.W.3d 542, 546 (Ark. 2002). Applying these

---

[1] Summary judgment is hereby granted on all other claims plaintiff may be asserting in spite of her representations as she has not addressed any claims other than false light and outrage in her response to defendants' motions for summary judgment and, thus, has not come forward with specific facts showing that there are genuine issues for trial on other such claims.

considerations, this Court determines that Tennessee law should be applied as Tennessee has the more significant interest in the outcome of the issues involved. *See Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620 (8th Cir. 2001) (noting that an Arkansas Court is "'free to apply the substantive law of a sister state where it finds that such state has a significant interest in the outcome of the issues involved'") (quoting *Williams v. Carr*, 263 Ark. 326, 565 S.W.2d 400, 404 (1978)).

Predictability of results and application of the better rule of law are not of great concern here as the respective immunity statutes of Arkansas and Tennessee provide a relatively similar remedy (although Tennessee's is somewhat stronger) and the Court cannot say one is "better" than the other. In addition, predictability of results has no bearing on an unplanned injury such as Branson's injuries. *See Hughes*, 250 F.3d at 620. Likewise, simplification of the judicial task is not a paramount consideration as this Court is able to apply the law of either state without difficulty.

The Court does find, however, that maintenance of interstate and international order and advancement of the forum's governmental interests weigh in favor of applying Tennessee law. Tennessee is the state with the more substantial concern with the matter at issue. As noted by defendants, LeBonheur is located in Tennessee, plaintiff chose to bring Branson from Arkansas to Tennessee for treatment and evaluation by Tennessee medical professionals, and that is where in fact the child was treated and evaluated. In addition, the decision to report Branson's injuries as suspicious of child abuse was initiated in Tennessee and made pursuant to Tennessee law, which mandates the reporting of child abuse, *see* Tennessee Code Annotated ("T.C.A."), § 37-1-403, and the medical professionals were functioning under Tennessee law. While Arkansas has

an interest in protecting its residents who are victims of torts, the Court agrees with defendants that Tennessee health care professionals should not, as a general matter, be subjected to the jurisdiction or differing laws of other states based upon what they perceive to be proper compliance with Tennessee law, and that if medical professionals feared the possibility of being subjected to the laws of other states based on their compliance with Tennessee reporting requirements, this could have a chilling effect on the reporting of suspected child abuse. Accordingly, this Court will apply Tennessee law.

C.

Concerning plaintiff's false light and outrage claims – the only claims remaining – LeBonheur and Dr. Walling move for summary judgment on grounds (among others) that they are entitled to immunity from liability for actions arising out of their statutory duty to report suspected child abuse, plaintiff has failed to produce any expert testimony which would demonstrate they failed to comply with the applicable standard of care in regard to any of plaintiff's tort claims, and plaintiff's tort claims fail on their merits. Defendants argue there are no genuine issues of material fact with respect to these issues and that they are entitled to summary judgment as a matter of law.

1.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citations omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. (citation omitted).

2.

This Court agrees with defendants that they are cloaked with immunity against plaintiff's false light and outrage claims by Tennessee's child abuse reporting statute.  Defendants were required to report the suspected child abuse of Branson under T.C.A. § 37-1-403, which provides, in pertinent part, as follows:

> (a)(1) Any person who has knowledge of or is called upon to render aid to any child who is suffering from or has sustained any wound, injury, disability, or physical or mental condition shall report such harm immediately if the harm is of such a nature as to reasonably indicate that it has been caused by brutality, abuse or neglect or that, on the basis of available information, reasonably appears to have been caused by brutality, abuse or neglect.

(2) Any such person with knowledge of the type of harm described in this subsection (a) shall report it, by telephone or otherwise, to the:

>   (A) Judge having juvenile jurisdiction over the child;

>   (B) Department, in a manner specified by the department, either by contacting a local representative of the department or by utilizing the department's centralized intake procedure, where applicable;

>   (C) Sheriff of the county where the child resides; or

>   (D) Chief law enforcement official of the municipality where the child resides.

Having properly made the required report of suspected child abuse (as conceded by plaintiff), defendants are immune for making such a report under T.C.A. § 37-1-410, which provides, in pertinent part, as follows:

> (a)(1) IF a health care provider makes a report of harm, as required by the provisions of § 37-1-403; AND

> IF the report arises from an examination of the child performed by the health care provider in the course of rendering professional care or treatment of the child; THEN

> The health care provider shall not be liable in any civil or criminal action that is based solely upon:

>>   (A) The health care provider's decision to report what such provider believed to be harm;

>>   (B) The health care provider's belief that reporting such harm was required by law; or

>>   (C) The fact that a report of harm was made.

>                        *   *   *   *

> (4)(A) IF absolute immunity is not conferred upon a person pursuant to subdivision (a)(1); AND

>>   IF, acting in good faith, the person makes a report of harm, as

>    required by the provisions of § 37-1-403; THEN
>
>    The person shall not be liable in any civil or criminal action that is based solely upon:
>
>    >    (i) The person's decision to report what the person believed to be harm;
>    >
>    >    (ii) The person's belief that reporting such harm was required by law; or
>    >
>    >    (iii) The fact that a report of harm was made.
>
>    (B) Because of the overriding public policy to encourage all persons to report the neglect of or harm or abuse to children, any person upon whom good faith immunity is conferred pursuant to this subdivision (a)(4) shall be presumed to have acted in good faith in making a report of harm.

Thus, under Tennessee law, physicians and other health care providers are typically entitled to immunity for reporting their suspicions of child abuse, with such immunity extending to the diagnosis, reporting, and subsequent communications with state officials regarding the medical diagnosis rendered by the physicians. *Bryant-Bruce v. Vanderbilt University, Inc.*, 974 F.Supp. 1127, 1139 (M.D.Tenn. 1997). Plaintiff, however, asserts that defendants are not entitled to rely upon the statutorily granted immunity because they acted in bad faith by allegedly not communicating to Arkansas authorities what she claims to be a "high likelihood of a secondary diagnosis" as set forth in x-ray report of January 30, 2003. She states that Dr. Walling "willfully withheld subsequent exculpatory findings from the Arkansas authorities, continuing instead to insist on his abuse theory." Pl.'s Resp. to Def.s' Mot.s for Summ. J. at 12. Plaintiff also alludes to a personality clash between Dr. Walling and plaintiff's mother, Pam Goucher, stating that he spoke arrogantly to Ms. Goucher, refused to listen to her assertions that Branson had not suffered child abuse, and did not care that his actions harmed plaintiff. *Id*. In

view of the circumstances under which reports of child abuse are made, however, it is incumbent upon plaintiff to show more than mere dislike for the alleged perpetrators or their suspected actions. *Bryant-Bruce*, 974 F.Supp. at 1141.  Rather, plaintiff "must demonstrate by *clear and convincing evidence*" that defendants acted in bad faith in order to deprive defendants of their immunity.  *Id*. at 1139, 1141 (emphasis in original).  Plaintiff has failed to so demonstrate.[2]

First, the undisputed evidence shows that defendants did in fact forward the January 30, 2003 report to Detective McDougal, the investigative authority in this matter.  McDougal aff. at ¶ 4; Walling Depo. at 55.  In this respect, there is nothing in the record indicating that Dr. Walling "willfully withheld" the conclusions of this report as the report containing those conclusions was in fact provided to McDougal by defendants.  Rather, Dr. Walling simply told McDougal that it was his opinion that Branson's injuries could not have been anything other than child abuse.  Walling Depo. at 58.  Dr. Walling's opinion ultimately turned out to be incorrect, but plaintiff has not demonstrated that Dr. Walling's belief during the relevant time that Branson's injuries were the result of child abuse (and his communication of that belief to McDougal) constitutes bad faith.  Indeed, T.C.A. § 37-1-410 contemplates that reports of suspected abuse will be based on the belief of the person making the report and presumes that person will have acted in good faith in making a report of harm.  Plaintiff has not presented evidence that would overcome that presumption.

---

[2] Dr. Walling did not specifically state that he did not care that his actions harmed plaintiff.  Rather, what he stated in response to questioning from plaintiff's counsel was that his responsibility was to evaluate allegations of child abuse and make reports to the authorities, that he is an advocate for the child, that he did not have any regrets in this particular case, that negative connotations to parents are a part of the process in cases of alleged abuse, that mistakes happen, and that it did not bother him that plaintiff was unable to work in order to care for her child while this was going on or that DHS may have told plaintiff that there was a strong possibility that her child could be removed from the home.  Walling Depo. at 83-86.  Plaintiff has not demonstrated with this or other evidence that Dr. Walling's continued belief that Branson's injuries were the result of abuse was motivated by any dislike for plaintiff or her mother.  Indeed, plaintiff's mother noted that Dr. Walling seemed concerned about the child.  Goucher Depo. at 75.

Moreover, plaintiff has not addressed the standard of care regarding Dr. Walling's continued belief that Branson's injuries were caused by abuse – a determination that involves a medical professional's medical judgment and opinion. In this respect, Dr. Walling's final diagnosis of abuse was his medical opinion, *see* Walling Depo. at 52, 58, and plaintiff has not produced any expert testimony demonstrating that Dr. Walling's opinion was unreasonable. The Court agrees with defendants that plaintiff is required to have such testimony. *See Lawrence County Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn. 1981) ("[t]he inner workings of the human body, surgical procedures, proper diagnostic techniques, and other medical activities are not within the knowledge of average ordinary laymen").[3] Defendants, in contrast, have produced expert testimony indicating that Dr. Walling's medical opinion and actions surrounding his opinion were reasonable. In this respect, Dr. Stephen M. Schexnayder, M.D., Chief, Section of Critical Care Medicine, University of Arkansas for Medical Sciences Department of Pediatrics, reviewed the records and concluded that there was a good faith basis to believe that Branson was a victim of child abuse as a rib fracture on a child Branson's age is usually the result of non-accidental trauma, and the fact that there was some possible other explanation for the rib fractures does not exclude abuse from the list of potential causes. Schexnayder Aff. at ¶ 6. Dr. Schexnayder, who is frequently consulted on abuse cases by Arkansas Children's Hospital, further opined that nothing in Dr. Kaufman's x-ray report of January 30, 2003, necessitated that LeBonheur and/or its professional staff take any further action at that time. *Id*. at ¶¶ 3, 8. Likewise, Judy Mullins, a medical social worker at the Blair E. Batson Children's Hospital

---

[3] Arkansas law is essentially the same. *See Skaggs v. Johnson*, 915 S.W.2d 253 (Ark. 1996) (summary judgment proper where plaintiffs had no expert to testify as to the breach of the applicable standard of care in medical malpractice action; a plaintiff must present expert testimony when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, when the applicable standard of care is not a matter of common knowledge, and when the jury must have the assistance of experts to decide the issue of negligence).

involved in the investigation and reporting of suspected child abuse and neglect cases, stated that in her professional opinion there was a good faith basis to believe Branson was a victim of child abuse, that there is nothing in the medical records to indicate that LeBonheur's social work department needed to take any additional action after the initial reporting of the child's injury as suspected child abuse, and that the hospital personnel complied with and did not deviate from the standard of care, skill, treatment and practice applicable to them in regard to their duty to report suspected child abuse. Mullins Aff. at ¶¶ 3-5. Plaintiff has failed to rebut the expert testimony of Schexnayder and Mullins (or contest their qualifications as experts) and she has failed to demonstrate by clear and convincing evidence that Dr. Walling's opinion concerning the cause of Branson's injuries was unreasonable or that defendants acted with anything other than good faith both before and after the January 30, 2003 x-ray report. Plaintiff at most has demonstrated a disagreement among physicians, but she cites no authority suggesting that such disagreement is to be made a part of the reporting requirement or that failure to acknowledge such disagreement in the report of suspected abuse constitutes bad faith. Accordingly, defendants are entitled to immunity on plaintiff's false light and outrage claims. *Cf. Bryant-Bruce*, 974 F.Supp. 1127 (noting that while physicians may have been incorrect or even negligent in their diagnosis of child's condition as "shaken infant syndrome," the evidence did not support the conclusion that the physicians acted in bad faith, were grossly negligent in their duties, or that there were no objective signs of abuse; physicians' stubborn refusal to reassess their original diagnosis and refusal to admit their initial diagnosis was in error did not support a finding of bad faith in complying with the reporting requirements of the statute).

      Even were defendants not entitled to immunity, the Court finds that plaintiff's false light

and outrage claims would fail on their merits. In *West v. Media General Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001), the Supreme Court of Tennessee recognized the tort of false light and adopted the definition set out in Section 652E of the Restatement (Second) of Torts (1977):

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if
>
>> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>>
>> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Plaintiff has presented no evidence demonstrating that Dr. Walling's continued belief that Branson's injuries were the result of abuse was false or in reckless disregard and she has not controverted defendants' evidence that their actions were in good faith. Accordingly, the Court grants defendants' motions for summary judgment on plaintiff's false light claim.

Plaintiff's claim of outrage likewise fails. Under Tennessee law, there are three essential elements to the tort of outrageous conduct: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618 (Tenn. 1997). In describing these elements, the Supreme Court of Tennessee has emphasized that "it is not sufficient that a defendant 'has acted with an intent which is tortious or even criminal or that he has intended to inflict emotional distress.'" *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (citations omitted). Rather, "[a] plaintiff must in addition show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and

utterly intolerable in civilized community." *Id*.

Again, plaintiff has presented no evidence supporting her claim that defendants, whether intentionally or recklessly, failed to disclose to Arkansas authorities the January 30, 2003 x-ray report (the report was in fact provided to Detective McDougal), and she has in no way demonstrated that defendants' conduct – including Dr. Walling's continued belief that Branson's injuries were a result of abuse – was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in civilized community.

In sum, LeBonheur and Dr. Walling are entitled to summary judgment on grounds that they are immune from liability for actions arising out of their statutory duty to report suspected child abuse, plaintiff has failed to produce any expert testimony which would demonstrate they failed to comply with the applicable standard of care in regard to plaintiff's remaining tort claims, and plaintiff's tort claims fail on their merits.[4]

III.

For the foregoing reasons, the Court finds that the motions for summary judgment by LeBonheur [doc.#46] and Dr. Walling [doc.#53] should both be and hereby are granted.

---

[4] The Court would resolve defendants' motions in the same way even were it proceeding under Arkansas law given the similarity between Tennessee and Arkansas law. Specifically, Arkansas requires the same elements of proof as Tennessee for a claim of false light, *see Dodson v. Dicker*, 812 S.W.2d 97, 99 (Ark. 1991), and an outrage claim under Arkansas law, like Tennessee, requires a showing that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *See M.B.M. Co. v. Counce*, 596 S.W.2d 681, 687 (Ark. 1980). Further, Arkansas, like Tennessee, mandates that physicians (among others) "shall" report child abuse of which they have "reasonable cause to suspect," *see* Ark. Code Ann. § 12-12-507(b), and a physician making such a report in "good faith" is immune from suit. Ark. Code Ann. § 12-12-517. *See also Cundiff v. Crider*, 792 S.W.2d 604, 605 (Ark. 1990) (noting that § 12-12-507 "impos[es] a compelling duty on the classes of persons named therein to act when they have 'reasonable cause to suspect'" abuse, and that those individuals acting in good faith are immune from suit).

Judgment will be entered accordingly.

        IT IS SO ORDERED this 30th day of March, 2006.

                                          /s/Susan Webber Wright

                                          UNITED STATES DISTRICT JUDGE